IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| WILLIAM MENKE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 1:12-cv-066-MEF |
| ) | (WO - Do Not Publish) |
| TRIAD OF ALABAMA, LLC, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Triad of Alabama, LLC d/b/a Flowers Hospital's (the "Hospital") Motion for Partial Summary Judgment (Doc. #56), filed on July 29, 2013, and Plaintiff William Menke's ("Menke") Motion for Partial Summary Judgment on Defendant's Affirmative Defenses (Doc. #58), which was filed the same day. Also before the Court is the Hospital's Motion to Strike Portions of Plaintiff's Affidavit Testimony (Doc. #67). Having considered the parties' arguments, the evidentiary submissions, and the record as a whole, the Court finds that the Hospital's Motion for Partial Summary Judgment is due to be GRANTED, Menke's Motion for Partial Summary Judgment is due to be DENIED, and the Hospital's Motion to Strike is due to be DENIED.

**I. JURISDICTION**

The Court has subject matter jurisdiction over the claims in this action under 28 U.S.C. § 1332 (diversity). The parties do not contest personal jurisdiction or venue, and the Court finds adequate allegations in support of both.

## II.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Id.* at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Id.* at 322–23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, a district court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the non-moving party has responded to the motion for summary judgment, the district court must grant summary judgment if there is no genuine dispute of material fact and the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## III.  FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motions. The submissions of the parties establish the following facts:

### A.  Menke, the Deferred Compensation Agreement, and the Endorsement Split-Dollar Plan

Menke began working for the Hospital full-time in late 1987 and continued to serve as the Vice President of External Affairs for the Hospital until his termination on April 12, 1996. Menke oversaw the Home Care Services division of the Hospital. He was also a member of the Hospital's executive team.

On June 20, 1990, Menke executed a Deferred Compensation Agreement ("DCA") and an Endorsement Split-Dollar Plan ("ESDP"). Menke was one of four members of the Hospital's executive team to receive a DCA and ESDP. Menke was told by John Edge ("Edge"), the Hospital's Administrator at the time, that the board wanted to give upper management deferred compensation agreements for the past work they had done and to encourage their continued loyalty to the Hospital. Menke testified that he never saw these agreements prior to their execution by the Hospital. Menke also testified that he believed the

Hospital intended to honor these agreements at the time they were executed.

The DCA provides that the Hospital would make monthly installment payments to Menke starting when he reached retirement (*i.e.*, the age of sixty). The total cash sum payable to Menke under the DCA is $750,000, subject to a vesting percentage based on Menke's years of service. According to the DCA, in the event that the Hospital is acquired, which occurred in this case,[1] Menke became fully vested for the entire $750,000 amount, irrespective of his years of service. (Doc. #57-2.) The amount of deferred compensation payable to Menke under the DCA is referred to as the "Deferred Compensation Account," although there is no evidence that an actual bank account containing his deferred compensation funds exists or ever existed. The Hospital is not obligated under the DCA to fund its obligations; rather, its obligation to Menke under this agreement is an "unfunded and unsecured promise to pay." (Doc. #57-2.) However, the Hospital has stipulated that a "Deferred Compensation Account" is held and funded by the Hospital. (Doc. #30.) The amount payable under the DCA is nonforfeitable upon vesting. (Doc. #57-2.)

The Hospital funds its obligations under the DCA through the ESDP. Under the ESDP, the Hospital makes annual premium payments for a life insurance policy on Menke in the amount of $750,000. The Hospital owns the policy, while Menke is the insured. The policy issued on Menke is policy No. 92312029 through TransAmerica Occidental Life

---

[1] The Hospital has stipulated that Triad, its current owner, assumed any obligations arising under the DCA and the ESDP when Triad acquired the assets of its predecessor (*i.e.*, Quorum Health Group, which acquired Flowers Hospital). (Doc. #30.)

Insurance Company. (Doc. #57-3.) The ESDP can be terminated only with the "mutual written consent of both parties." (Doc. #57-3.)

**B.     Menke's Termination**

Beginning in the mid-80's, and during his employment with the Hospital, Menke operated a consulting firm called Phoenix Services, Inc. ("Phoenix"). One of the entities for which Menke claims he did consulting work through Phoenix was The Riley Group. The Riley Group paid Phoenix for Menke's work on an hourly basis via check. During this same time, the Riley Group also had an agreement with the Home Care Services division of the Hospital, which was under Menke's supervision, to provide the software support for its billing and operations.

Menke was terminated by the Hospital on April 12, 1996. The Hospital claims that, from 1989 until sometime in 1996, Menke engaged in a scheme whereby the Hospital, though its Home Care Services division, would overpay The Riley Group for software services it provided to the Hospital. Menke would deliver a check payable to The Riley Group from Home Care Services each month, along with an invoice for services provided to The Riley Group by Phoenix. The checks received by The Riley Group from Home Care Services were always more than the invoices The Riley Group received from Phoenix. The Riley Group would then pay the Phoenix invoices and keep the difference.

The Hospital terminated Menke shortly after it discovered this scheme, which the Hospital perceived as both a kickback and a conflict of interest. Menke denies ever instructing The Riley Group to pay a portion of the payments it received from the Hospital

to him via Phoenix. Menke claims that any payments Phoenix received from The Riley Group were for consulting services he performed for them. However, Bobby Riley, owner of The Riley Group, denied that Menke or Phoenix ever did consulting work for him. He believed that Phoenix was a hospital-related entity and that his payments to Phoenix were part of an accounting mechanism used by the Hospital.

**C.     Payments under the DCA and ESDP**

In 1998, an attorney for Menke sent Keith Granger, the Hospital's Chief Executive Officer at the time, a letter to confirm the Hospital's obligations under the DCA and the ESDP. Menke sent the Hospital another letter dated November 1, 2010, again stating his understanding of the DCA and the ESDP and noting that his deferred compensation payments should begin in February 2011. There is no evidence that the Hospital responded to the specifics of either letter, but it did begin sending Menke 1099 forms for tax liability created by virtue of the benefits provided under the ESDP as early as 1994.

Menke turned sixty on January 21, 2011, and is fully vested under the DCA, but the Hospital has not made any payments to Menke under the DCA. The Hospital contends that both the DCA and ESDP are unenforceable based on Menke's fraudulent actions with The Riley Group that resulted in his termination in 1996.[2] The Hospital has nonetheless

---

[2] An additional reason Suzanne Woods, the Hospital's current Chief Executive Officer, gave for not paying Menke under the agreements is that he is listed as an excluded provider by the Office of Inspector General for Medicare purposes, and if the Hospital had paid him as an excluded provider, it would have essentially been committing Medicare fraud. However, the parties now agree that Menke is no longer listed as an excluded provider, and the Hospital concedes that it is no longer pursuing an illegality/impossibility defense based on Menke's status as an excluded provider. Thus, Menke's motion for partial summary judgment on the Hospital's impossibility/illegality

continued to pay premiums on the insurance policy under the ESDP and has sent Menke 1099 forms for the 1994, 1998, 2000, 2003, and 2005 through 2012 tax years.  Menke paid his tax liability under the ESDP before his termination and has continued to do so after his termination.

## IV.  DISCUSSION

On June 25, 2012, Menke filed his Second Amended Complaint, alleging claims against the Hospital for breach of contract (Counts One and Three), misrepresentation (Counts Two and Four),[3] and conversion (Count Five).  (Doc. #34.)  On July 10, 2012, the Hospital filed its Answer and asserted various affirmative defenses.[4]  (Doc. #35.)  The Hospital has now moved for partial summary judgment on Menke's misrepresentation and conversion claims.  (Doc. #56.)  In response, Menke has moved for partial summary judgment on the Hospital's affirmative defenses of fraud in the inducement, failure of consideration, unclean hands, and impossibility/illegality.  (Doc. #58.)  In addition, the Hospital has filed a Motion to Strike, requesting the Court to strike certain portions of Menke's affidavit, which was submitted in opposition to the Hospital's motion for partial summary judgment, on the basis that Menke's affidavit is, at least in part, a sham.  (Doc.

---

defense is DENIED as MOOT.

[3] Counts Two addresses the DCA, while Count Four addresses the ESDP.

[4] Although the Hospital was granted leave to file an Amended Answer on December 4, 2012, an Amended Answer was never filed.  (Docs. #41, 44.)  This oversight is inconsequential, though, as the affirmative defense that was to be added through the amendment has been waived by the Hospital.  (Doc. #63.)

#67.)

**A.     Motion to Strike**

The Hospital contends that paragraphs 3, 5, and 7 of the affidavit Menke submitted in opposition to the Hospital's motion for partial summary judgment are due to be stricken as "shams" because they contradict or are inconsistent with Menke's prior unambiguous deposition testimony.  (Doc. #67.)  A district court may disregard portions of a party's affidavit in ruling on a summary judgment motion "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact" and the party "thereafter [attempts to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  Before striking affidavit testimony, a district court must find some inherent inconsistency between the affidavit testimony and the testimony given at deposition.  *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987).  Indeed, "every discrepancy . . . in an affidavit does not justify a district court's refusal to give credence to such evidence."  *See Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (internal quotations omitted).  This is because doing so would "allow every failure of memory or variation in a witness's testimony to be disregarded as a sham [which] would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth."  *Id.* at 953–54 (alterations to original).

Applying these principles to this case, and resolving all doubts in favor of the non-moving party, the Court finds that paragraphs 3, 5, and 7 of Menke's affidavit are not so clearly and inherently inconsistent with his deposition testimony that they are due to be stricken as "shams." Rather, the Court finds that, to the extent there are inconsistencies between Menke's affidavit testimony and the testimony given during his deposition, resolving such inconsistences would require the Court to make credibility determinations (*i.e.*, what testimony of Menke's, if any, should be believed and what weight, if any, should be given to that testimony), which is a job solely within the province of the jury. Accordingly, the Hospital's Motion to Strike (Doc. #67) is DENIED.

**B.     The Hospital's Motion for Partial Summary Judgment**

The Hospital is seeking summary judgment on Counts Two, Four, and Five of Menke's Second Amended Complaint. Counts Two and Four assert misrepresentation related to the DCA and the ESDP, respectively, and Count Five asserts conversion of the monies allegedly owed Menke under the DCA and the ESDP. (Doc. #34.) The parties' arguments are addressed below.

### 1.     Misrepresentation Claims

As to the misrepresentation claims, which the Court will address together, Menke alleges that Counts Two and Four should survive summary judgment because genuine disputes of material facts exist regarding (1) the material representations made by the Hospital regarding the DCA and the ESDP, (2) the nature of the Deferred Compensation Account created by the DCA and the ESDP, and (3) the continued representations by the Hospital related to its understanding of its requirements and obligations under these agreements. However, the Hospital contends that Counts Two and Four are, in actuality, claims of promissory fraud, which would require Menke to prove two additional elements, namely, that the Hospital did not intend to perform under the agreements at the time they were made and that the Hospital intended to deceive Menke. Because Menke cannot meet this burden, the Hospital claims that summary judgment is due to be granted on these claims.

The threshold issue for summary judgment on Menke's misrepresentation claims is whether these claims are ones for traditional fraud or ones for promissory fraud. In Alabama, the elements of a traditional fraud claim are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damages as a proximate result. *See Ex Parte Michelin N. Am., Inc.*, 795 So. 2d 678, 679 (Ala. 2001). However, the law places a heavier burden on claims for promissory fraud. Such claims are "based upon a promise to act or not to act in the future." *Padgett v. Hughes*, 535 So. 2d 140, 142 (Ala. 1988). As stated above, when compared to traditional fraud, promissory fraud requires proof of two additional elements: that, at the time of the misrepresentation, the

defendant had the intent not to perform the act promised, and that the defendant had the intent to deceive. *See id.*; *Heisz v. Galt Indus., Inc.*, 93 So. 3d 918, 925 (Ala. 2012). However, a plaintiff cannot meet its burden of showing intent to deceive merely on the basis that the promise was not kept. *See Wright v. Amsouth Bancorporation*, 320 F.3d 1198, 1204 (11th Cir. 2003).

Counts Two and Four of the Second Amended Complaint allege that the Hospital made representations to Menke about the amount and manner in which he would be compensated under the DCA and the ESDP, that he was induced to act through continued employment with the Hospital based on these representations, and that Menke has been damaged as a result. (Doc. #34.) Menke further alleges in these counts that, based on the Hospital's refusal to follow the agreements or to provide Menke with any explanation, credible or otherwise, for its alleged breach of these agreements, it is "apparent" that the Hospital "had no intention of honoring these representations made to [] Menke concerning the amount and manner in which he would be compensated." (Doc. #34.) Based on these allegations, the Court concludes that Menke's misrepresentation claims are ones for promissory fraud rather than traditional fraud.

This conclusion is further supported by the terms of the agreements themselves. Under the DCA, the Hospital promised to make **future** monthly installment payments to Menke starting when he reached the age of retirement. Under the ESDP, the Hospital promised to make **future** annual premium payments on an insurance policy with Menke as the insured. However, the DCA makes clear that the Hospital is not required to fund its

11

obligations to Menke; rather, its obligation to Menke under the DCA are described in the agreement as an "unfunded and unsecured promise to pay" in the **future**. (Doc. #57-2.) Indeed, the Deferred Compensation Account, as referenced in the DCA, is not an actual account but simply the nomenclature given to the amount of money owed to Menke under the DCA. (Doc. #57-2.) In other words, based on the allegations of the Second Amended Complaint and the terms of the agreements themselves, the misrepresentations of which Menke complains relate to promises of future action by the Hospital (*i.e.*, to pay Menke under the terms of the DCA and the ESDP upon him reaching the age of retirement) and, therefore, constitute claims for promissory fraud.[5]

---

[5] In his opposition to the Hospital's partial summary judgment motion, Menke argues that his misrepresentation claims are based on representations made up to the time of execution of the DCA and the ESDP, as well as representations made after his termination in 1996. In support of this argument, Menke points to the fact that the Hospital has continued to send him 1099 tax forms related to the ESDP, even after his termination, thereby implying that the Hospital intended to fulfill its obligations under the agreements when it knew after Menke's termination that it had no intention of doing so. (Doc. #64.) However, the misrepresentation claims as pled in the Second Amended Complaint make no mention of 1099 tax forms sent to Menke by the Hospital, 1099 tax payments Menke made for liability created under the ESDP, Menke's financial planning decisions based on the DCA and the ESDP, or specific misrepresentations made by the Hospital after Menke's termination. Rather, Menke alleges that, "[b]efore and up to the time of execution of the DCA and the ESDP, in an attempt to encourage [] Menke to sign the contracts and incentivize continued employment, agents and/or representatives of [the] Hospital represented to [] Menke that the two agreements would be honored[.]" (Doc. #34.) Because the tax and financial planning "misrepresentations" were not pled in the Second Amended Complaint, and are essentially new facts on which Menke is attempting to base his misrepresentation claims, the Court will not consider them at summary judgment as to Menke's fraud claims. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). However, this should not be construed to limit Menke's ability to present evidence of these allegations at trial on his breach of contract claim.

As previously noted, in Alabama, claims for promissory fraud require proof of two elements in addition to those required for a traditional fraud claim—(1) that, at the time of the misrepresentation, the defendant did not intend to perform the act promised and (2) that, at the time of the misrepresentation, the defendant had the intent to deceive. *See Heisz*, 93 So. 3d at 925. In this case, the Court agrees with the Hospital that Menke cannot meet his burden as to these additional elements. Menke testified in both his deposition and his affidavit that he had absolutely "no reason to believe that the Hospital would not honor the terms of these agreements" at the time they were executed. In fact, Menke testified that he "had every expectation that the agreements would be honored." (Doc. #65-1.) The parties have also not pointed the Court to other substantial evidence suggesting that, at the time the agreements were made, the Hospital did not intend to perform under the agreements' terms and, instead, intended to deceive Menke. Thus, because the undisputed evidence shows that there is no triable issue as to Menke's promissory fraud claims, the Hospital's motion for summary judgment on those claims is GRANTED.

    **2.    Conversion Claim**

Count Five of the Second Amended Complaint alleges that the Hospital converted funds to be paid to Menke under the DCA. (Doc. #34.) Under Alabama law, a claim for conversion requires proof of either a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another's property, or a wrongful detention or interference with another's property. *See South Trust Bank v. Donely*, 925 So. 2d 934, 939 (Ala. 2005) (internal quotations omitted). Even money can be converted. *Id.* However, an action for

conversion of money "will not lie unless the money is specific and capable of identification." *Riscorp, Inc. v. Norman*, 915 So. 2d 1142, 1152 (Ala. 1994) (internal quotations omitted). In other words, "'[a]n action alleging conversion of money lies only where there is an obligation to deliver the specific pieces of the money in question or money that has been specifically sequestered, rather than a mere obligation to deliver a certain sum.'" *Ledbetter v. Un. Ins. Co. of Am.*, 837 F. Supp. 381, 384 (M.D. Ala. 1993) (quoting *Johnson v. Life Ins. Co. of Ala.*, 581 So. 2d 438, 443 (Ala. 1991)); *see also Lewis v. Fowler,* 479 So. 2d 725, 727 (Ala. 1985) (recognizing "[w]hen there is no obligation to return the identical money, but only a relationship of debtor or creditor, an action for conversion of funds representing the indebtedness will not lie against the debtor"). Moreover, "[a]n obligation to pay . . . is ordinarily enforceable by assumpsit or a contract action, but such will not support an action for conversion." *McCain v. P.A. Partners Ltd.*, 445 So. 2d 271, 273 (Ala. 1984).

Here, Menke's conversion claim concerns an obligation to deliver money under the DCA. This is an obligation enforceable through Menke's breach of contract action; it does not give rise to a claim of conversion. Rather, the relationship created between the Hospital and Menke by the DCA is likened to that of a creditor-debtor relationship for which claims of conversion do not apply. Indeed, the disputed funds represent an obligation by the Hospital to deliver a certain sum, rather than specific pieces of money, to Menke. While Menke claims that a Deferred Compensation Account was created by the DCA and that the parties stipulated that this account is still being held and funded by the Hospital, this is not evidence that the Hospital converted specific pieces of money owed to Menke. As

14

previously noted, the Deferred Compensation Account is merely a term used to refer to the sums owed Menke under the DCA, and the undisputed evidence shows that there is no separate bank account that holds or earmarks the money allegedly due Menke under the DCA. Moreover, the fact that the Deferred Compensation Account is still being held and funded by the Hospital simply means that the Hospital is continuing to pay the premiums on the life insurance policy that funds Menke's DCA.

Finally, the Court notes that, in support of his conversion claim, Menke has submitted a spreadsheet produced by the Hospital entitled "Quorum Deferred Compensation," which shows the net present value of the amount owed to Menke (and the other three managers who were given deferred compensation agreements) as of March 31, 2013, as evidence that a separate, earmarked account exists for Menke's DCA funds. However, this spreadsheet does not evidence that the Hospital is maintaining a separate account holding specific and identifiable funds for Menke. In fact, the Chief Financial Officer for the Hospital testified that no such account exits. Rather, the number attributable to Menke on the spreadsheet represents the present cash value, according to the insurer's schedule, of the insurance policy on Menke's life, which is used to fund the Hospital's obligations to Menke, if any, under the DCA.

In sum, the Court finds that Menke has not presented sufficient evidence to create a triable issue as to his conversion claim. Thus, the Hospital's motion for summary judgment on this claim is GRANTED.

**C.     Menke's Motion for Partial Summary Judgment**

Menke is seeking summary judgment on the Hospital's affirmative defenses of fraudulent inducement, unclean hands, and failure of consideration.[6] (Doc. #58.) All of these defenses go to Menke's breach of contract claims and the Hospital's obligations to Menke under the DCA and the ESDP. Specifically, these defenses are premised on the Hospital's claim that Menke was engaged in a kickback scheme at the time the agreements were executed, thereby relieving them of their obligations under these agreements. The Hospital contends that genuine disputes of material fact exist with respect to each of these defenses and that they should, therefore, go to the jury. (Doc. #63.) Menke contends that the Hospital cannot establish genuine disputes of material fact as to the defenses and that, even if Menke had been engaged in the kickback scheme alleged, such a scheme was independent of and unrelated to agreements between Menke and the Hospital.

Because Menke has moved for summary judgment on the Hospital's affirmative defenses, the Hospital bears the initial burden of showing that the affirmative defenses are applicable. *See Blue Cross & Blue Shield v. Weitz*, 913 F.3d 1544, 1552 n.13 (11th Cir. 1990). The Hospital has met this burden. Indeed, fraud, failure of consideration, and equitable estoppel/unclean hands are all recognized affirmative defenses. *See* Fed. R. Civ. P. 8(c)(1); *Troxler v. Owens-Illinois, Inc.*, 717 F.2d 530, 532 (11th Cir. 1983) ("In diversity of citizenship actions state law defines the nature of the defenses, but the Federal Rules of

---

[6] Menke was also seeking summary judgment on the Hospital's affirmative defense of impossibility/illegality, but the Court has already denied this part of the motion as moot given that the Hospital has withdrawn that defense. (Doc. #63.)

Civil Procedure provide the manner and time in which defenses are raised[.]") (internal quotations omitted).

Now the burden shifts to Menke to show that no genuine disputes of material fact exist as to the challenged affirmative defenses and that he is entitled to a judgment as a matter of law on those defenses. This Menke has failed to do. All three of the Hospital's affirmative defenses Menke is challenging—fraudulent inducement, unclean hands, and failure of consideration—stem from his purported kickback scheme with The Riley Group. As to the fraudulent inducement defense, the Hospital has presented evidence that, had it known that Menke was engaging in the purported kickback scheme with The Riley Group, it would have never entered into the DCA and the ESDP with Menke and would have likely terminated his employment following an investigation. Thus, the Hospital contends that Menke's misrepresentations, or rather his suppression, of his arrangement with The Riley Group fraudulently induced the Hospital to offer and to ultimately enter into the DCA and the ESDP with him.

The Hospital makes essentially the same arguments and presents the same evidence with respect to its lack of consideration and unclean hands defenses. As to these defenses, the Hospital has presented evidence, including Menke's own testimony, that the Hospital offered Menke the DCA and the ESDP in consideration for his previous work as well as his continued loyalty and employment with the Hospital. This was done in an effort to secure a profitable sale of the Hospital with a smooth transition of management. The DCA further states that Menke "agrees to promote the business of the Corporation and agrees to refrain

17

at all times from activities which may adversely affect the business of the Corporation." (Doc. #57-2.) The Hospital contends that, because Menke was engaged in a kickback scheme at the time the DCA and the ESDP were entered into, a scheme which financially harmed the Hospital, he did not provide his part of the bargained for consideration. In other words, as part of the DCA and the ESDP, Menke agreed to act in the best interests of the Hospital, when all the while, at least as the Hospital claims, Menke was stealing from the Hospital and acting with unclean hands.

Of course, Menke disputes the Hospital's claims and has presented evidence that he was not engaged in a kickback scheme, that he never instructed The Riley Group to submit part of the payments from the Hospital to Phoenix, and that any money Menke received through Phoenix was for consulting services. Menke further claims that, even if the alleged kickback scheme were true, the Hospital's unclean hands and fraudulent inducement defenses fail because the scheme was not "directly related" to the DCA or the ESDP and because it did not concern "the underlying transaction" at issue. *See Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 451 (11th Cir. 1993); *Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala. 2000). However, whether Menke ever engaged in the kickback scheme, whether that scheme was directly related to the DCA and the ESDP, and whether that scheme affected or otherwise concerned the agreements between the Hospital and Menke are disputed—indeed, vehemently disputed—issues that go to the very heart of Menke's contract claims and the Hospital's affirmative defenses to those claims. Accordingly, when taking all of the above in the light most favorable to the Hospital, as the

non-moving party, the Court concludes that genuine disputes of material fact exist as to the Hospital's fraudulent inducement, unclean hands, and lack of consideration affirmative defenses, and, therefore, these defenses should be submitted to the jury. Thus, Menke's motion for partial summary judgment is DENIED.

## V. CONCLUSION

Based on the foregoing, it is hereby ORDERED as follows:

1. The Hospital's Motion to Strike (Doc. #67) is DENIED;

2. The Hospital's Motion for Partial Summary Judgment (Doc. #56) is GRANTED;

3. Menke's Motion for Partial Summary Judgment (Doc. #58) is DENIED; and

  4. The parties shall submit a revised pretrial order with revised contentions consistent with this Memorandum Opinion and Order no later than 5:00 p.m., CST, on November 22, 2013.

  DONE this the 19th day of November, 2013.

             /s/ Mark E. Fuller
             UNITED STATES DISTRICT JUDGE